UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

PETER CORBETT,

      Plaintiff,

v.                         Civil Action No. 2:10-cv-01053

RONALD DUERRING and
THE KANAWHA COUNTY BOARD OF EDUCATION,

      Defendants.

## MEMORANDUM OPINION & ORDER

Pending is the motion for summary judgment of defendants Ronald Duerring ("Duerring") and the Kanawha County Board of Education (the "Board") (collectively, "defendants"), filed March 21, 2012.

### I. Factual and Procedural Background

In this action, plaintiff Peter Corbett ("Corbett") alleges that defendants terminated his employment in violation of his First Amendment right to free speech.  The following factual recitation is presented, as it must on motion seeking summary judgment, in the light most favorable to Corbett, the non-moving party, and is based largely on his deposition testimony.

In August 1989, Corbett was hired as a teacher and coach at George Washington High School ("GW") in Charleston, West Virginia.  In September 1998, he was promoted to the position of vice principal.  Duerring became superintendent of Kanawha County Schools in April 1999.

As GW's vice principal, Corbett's duties included the supervision and discipline of students.  In October 1999, Duerring summoned Corbett into his office to discuss certain disciplinary actions taken by Corbett in his capacity as vice principal.  (Pl.'s Dep. Vol. 1, at 29-30).  During this discussion, Duerring allegedly urged Corbett to "make deals with people on the hill," and implied that failure to do so would prevent Corbett from become a principal in the future.  (Id. at 33-35).  Duerring never explicitly directed Corbett to "make deals" based upon the economic status or influence of a student's parents.  (Id. at 37).  Nonetheless, Corbett states that "there was no question" that "the hill" to which Duerring made reference meant the affluent "South Hills" neighborhood of Charleston, and that to "make deals with people on the hill" meant to give preferential treatment to the students who came

from that area and whose parents were wealthy or influential.
(Id. at 38-40, 49-50).

According to Corbett, his interpretation of Duerring's comments is supported by a number of incidents both prior to and following the October 1999 meeting, in which defendants or their high-level employees provided or attempted to provide preferential treatment to certain students while Corbett's efforts to prevent this preferential treatment were overruled or met with hostility.  (Id. at 103-125, 142-166).  In one such incident, a student whose father is an attorney with connections to the Board "rammed" her vehicle into another student's car, causing substantial damage.  (Id. at 103-07).  Corbett's proposed three-day suspension was overruled in favor of a much less severe punishment. (Id. at 107-08).  On another occasion, Corbett claims, his attempts to discipline a student for habitual skipping were frustrated when the student's parent, who owns a "predominant [sic, prominent] business . . . in the Kanawha Valley," exerted influence to have the punishment commuted from above.  (Id. at 153-57).  Further, as a result of these incidents and others, Corbett felt as though he was

singled out for retaliation with respect to his use of sick leave.  (Id. at 60, 98-100, 201-02, 206-12).

The events leading directly to Corbett's firing began on April 20, 2007.  That day, Corbett supervised a group of students who were grilling hotdogs in the GW parking lot during a time when Nancy Alexander, then principal of GW, had announced, for safety reasons,[1] that "the outside of the building was closed."  (Id. at 74-88).  Typically, GW operated under an open campus policy, except when certain protocols were in effect, such as "the campus [was] closed" or "the outside of the building was closed."  Id.  According to Corbett, these terms had different meanings.  Id.  The longstanding meaning of the phrase, "the outside of the building was closed," as Corbett understood it, was that students were not allowed to be outside unless they were supervised by a faculty member.  (Id.).  According to Corbett, no one ever explained to him that Principal Alexander did not want students outside even when accompanied by a teacher.  Id.  Nevertheless, Corbett was

---

[1] Thursday, April 20, 2007, marked the 8th anniversary of the notorious Columbine student massacre.  Just four days earlier, on April 16, 2007, a deranged student shot and killed 32 individuals on the campus of Virginia Tech.  Defendants assert that it was in light of these events that Principal Alexander closed the campus to ensure the safety of GW's student body.  (Duerring Dep. 17-18).

reprimanded for supervising the cookout.  He later attempted to change the GW student handbook to clarify the meaning of the phrase, "the outside of the building is closed," as well as the procedure for notifying all affected persons when the campus was closed for safety reasons, but was prevented in doing so by school administrators.  (Id. at 81, 84-86, 232-233).

On June 15, 2007, defendants held a hearing to determine the appropriate punishment for Corbett's role in the April 20, 2007 cookout.  (Def. Duerring's Dep. at 34).  The hearing examiner recommended that "Mr. Corbett be suspended for one day without pay as a result of his insubordinate acts." (Id. at 35).  At Duerring's recommendation, the Board opted to disregard the hearing examiner's recommendation and instead suspended Corbett for five days without pay.  (Id. at 35-36). It was Corbett's belief that the true reason for his suspension was his continued resistance to Duerring's directive to "make deals" with the children of influential parents, and that he would not have been punished so severely if the students who participated in the cookout had been children of persons of influence.  (Pl.'s Dep. 76-77, 80, 237).

Thus, on November 27, 2007, while serving his five-day suspension, in what Corbett describes as an effort to "bring something positive out of something negative," he began grilling and selling hotdogs near the Board's headquarters.  (Id. at 235).  According to Corbett, his protest called attention to (1) issues relating to defendants' unequal treatment of students, arbitrary enforcement of rules at GW, and mistreatment of administrators who refused to comply with defendants' corrupt practices; and (2) the lack of clarity and effective communication at GW regarding protocols that affect student safety, such as the procedures for closing of the campus.  (Id. at 229-37).

On December 3, 2007, a few days after Corbett began his hotdog sale protest, Duerring notified Corbett via letter that

> [y]our [Corbett's] recent actions and statements demonstrate contempt and disrespect towards the Kanawha County Board of Education and the administration of Kanawha County Schools, which appear to be for the purpose of undermining their status, prestige, and authority, all of which constitute insubordination.  In addition, since these actions and statements relate solely to your status as an employee of Kanawha County Schools and do not relate to matters of general public concern, they are not protected by the First Amendment of the United States' Constitution.

6

(Dec 3, 2007 Letter from Duerring to Pl., Pl.'s Ex. 7).  The letter concluded by notifying Corbett that he was suspended, with pay, "pending further review and a determination of appropriate action to be taken."  (Id.)

Defendants' review included not only an investigation into the November 27, 2007, incident, but also into numerous unrelated events, many of which appear to have occurred before Corbett's protest, but which were not asserted as a basis for discipline until after his protest.  On March 31, 2008, in a letter addressed to Corbett, defendants submitted an extensive list of "charges," including, but not limited to: (1) insubordination with respect to the April 2007 cookout, the November 2007 protest, and several other incidents both prior to and following the protest; (2) several instances, dates not specified, constituting violation of various provisions of the employee code of conduct; (3) violations of Board policy prohibiting the use of school resources for private business purposes in connection with Corbett's scuba instruction ventures; (4) failing to properly discipline students who possessed drugs and drug paraphernalia; (5) "cruelty" related to "referring to female students undergarments as Victoria Secrets" and pouring liquid down a female student's pants; and (6)

7

willful neglect of duty based on failure to comply with disciplinary code and record requirements. (Pl.'s Ex 8, March 31, 2008, Letter Setting Forth Charges). The letter called for a hearing for the purpose of "determin[ing] whether or not disciplinary action should be recommended against you."

That hearing was held and testimony was taken on April 1-3, 2008; May 8, 2008; and May 27, 2008, before Anne B. Charnock, hearing examiner, at the Board's office in Charleston, WV. On August 25, 2008, the hearing examiner issued that which she designated as her "ruling,"[2] finding that "without question, Mr. Corbett continually violated the conflict of interest policy . . . was insubordinate on a number of occasions and in a number of manners . . . [and his] actions led to an unhealthy work and school environment." (Def.'s Ex. 7, Decision of the Hearing Examiner at 39,) As a result, she concluded, "[the Board] can dismiss Mr. Corbett for his misconduct." (Id.).

In an August 28, 2008, letter to Corbett referencing the hearing examiner's findings, Duerring notified Corbett of his intent to recommend Corbett's termination. (Pl.'s Ex. 9,

---

[2] Inasmuch as Ms. Charnock's conclusions were not binding in any way, "recommendation" seems to be a more appropriate description.

Letter from Duerring to Corbett).  Thereafter, Duerring did in fact recommend to the Board that Corbett be fired.  After learning of Duerring's recommendation, Corbett opted to retire in order to preserve his rights with respect to accumulated sick leave. (Pl.'s Dep., Vol. 2, 285-86, 315-316).  The Board later adopted Duerring's recommendation and voted to terminate Corbett's employment.  Corbett received formal notice of his termination in a letter from Duerring, dated September 9, 2008. (Pl.'s Ex. 11).

Before initiating this action, Corbett filed a broader action in the Circuit Court of Kanawha County on December 23, 2009, alleging three counts in his complaint: Count I - Wrongful Termination; Count II - Negligent Supervision; and Count III - 42 U.S.C. § 1983 (First Amendment retaliation).  Defendants removed to this court on January 29, 2010, and subsequently moved to dismiss on February 9, 2010.  On July 21, 2010, the court granted defendants' motion and dismissed the first two counts for failure to exhaust administrative remedies and the third count for failure to state a claim, all without prejudice. Regarding Corbett's § 1983 First Amendment retaliation claim, the court observed that Corbett "merely alleges that the defendants retaliated against him by disciplining him for

statements he made regarding matters of public concern.  He does not provide any indication as to the content, form, or context of his statements."[3]  Corbett v. Duerring, No. 2:10-102, slip op. at 25 (S.D. W. Va. July 21, 2010).  Accordingly, the court dismissed the action inasmuch as Corbett presented "insufficient factual matter to determine whether he has pled a claim for relief that is plausible on its face."  Id. at 27.

Corbett filed the current complaint with this court on August 27, 2010.  The sole count of the complaint, titled "Count I - 42 U.S.C. § 1983," asserts that defendants unlawfully terminated his employment in retaliation for his hotdog sale protest, which Corbett claims was protected First Amendment expression.  Corbett "demands judgment against Defendants for all lost wages and other special damages allowed by law; all emotional distress, humiliation, and other general damages

---

[3] Specifically, Corbett alleged as follows:

As a further part of Defendant Duerring's efforts to retaliate against Plaintiff, Defendant Duerring unfairly disciplined Plaintiff for a variety of actions undertaken by Plaintiff, including but not limited to actions and statements made by Plaintiff regarding matters of public concern and thus protected under the West Virginia and United States Constitutions.

Corbett v. Duerring, No. 2:10-102, slip op. at 23 (S.D. W. Va. July 21, 2010) (quoting Compl. ¶ 12).

allowed by law; all punitive damages allowed by law; attorneys
fees and costs to the extent permitted by law; and all such
other and further relief as the court deems just and proper."
(Compl. ¶ 6).

        Defendants' motion to dismiss the current complaint
was denied by Memorandum Opinion & Order entered January 28,
2011.  See Corbett v. Duerring, 780 F.Supp.2d 486 (S.D. W. Va.
2011).  Following extensive discovery, defendants now move for
summary judgment, contending that there are no genuine issues of
material fact as to any elements of Corbett's First Amendment
retaliation claim.

                    II. Motion for Summary Judgment

A.   Governing Standard

        A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
those necessary to establish the elements of a party's cause of

action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); <u>id.</u> at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts,

summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   First Amendment Retaliation Claim

It is well-settled that a public employer "may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern." Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (citing

13

Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968)).  To prove
that a retaliatory employment action violated a public
employee's free speech rights, the employee must satisfy the
following three prong-test formulated by the court of appeals in
McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998):

> First, the public employee must have spoken as a
> citizen, not as an employee, on a matter of public
> concern. Second, the employee's interest in the
> expression at issue must have outweighed the
> employer's interest in providing effective and
> efficient services to the public. Third, there must
> have been a sufficient causal nexus between the
> protected speech and the retaliatory employment
> action.

Id. at 277-78; see also Smith v. Frye, 488 F.3d 263, 267 (4th
Cir. 2007) (applying "the McVey test"); Ridpath v. Bd. of
Governors of Marshall Univ., 447 F.3d 292, 316 (4th Cir. 2006)
(same).  The court considers each prong of the McVey test in
turn.

### 1.  First McVey Prong- Matter of Public Concern

The court must first assess whether plaintiff's hotdog
sale protest touched on matters of public concern.[4]  "Whether

---

[4] Though defendants do not appear to dispute that plaintiff
spoke as a citizen rather than as an employee, the issue is
worthy of brief discussion.  Recently, in Garcetti v. Ceballos,
the Supreme Court held that "when public employees make
statements pursuant to their official duties, the employees are
(Cont'd)

speech is that of a private citizen addressing a matter of public concern is a question of law for the court," <u>Urofsky v. Gilmore</u>, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc), which must be determined by looking at "the content, form, and context of a given statement, as revealed by the whole record," <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983). "An employee's speech involves a matter of public concern if it addresses 'an issue of social, political, or other interest to a community.'" <u>Ridpath</u>, 447 F.3d at 316 (quoting <u>Urofsky</u>, 216 F.3d at 406-07). For instance, speech that "'seek[s] to bring to light actual or potential wrongdoing or breach of public trust'" generally implicates matters of public concern. <u>Jurgensen v. Fairfax Cnty., Va.</u>, 745 F.2d 868, 879 (4th Cir. 1984) (quoting <u>Connick</u>,

not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421 (2006). The court went on to explain that speech "pursuant to [] official duties" is speech that has been "commissioned or created" by the employer. <u>Id.</u> at 422.

In <u>Garcetti</u>, the court concluded that a deputy district attorney did not engage in protected speech when he wrote a disposition memorandum recommending dismissal of a case on the basis of purported governmental misconduct. Fourth Circuit cases following <u>Garcetti</u> have involved the release of internal memoranda, posting of material on a school bulletin board, and statements made during meetings at a plaintiff's place of employment. <u>See</u> <u>Andrew v. Clark</u>, 561 F.3d 261 (4th Cir. 2009); <u>Lee v. York County School Div.</u>, 484 F.3d 687 (4th Cir. 2007); <u>Bevis v. Bethune</u>, 232 F.Appx. 212 (4th Cir. 2007). In this case, unlike <u>Garcetti</u>, although Corbett's speech was related to his employment, his hotdog sale protest was not conducted pursuant to any official duty "commissioned or created" by defendants. As a result, this action is not barred by <u>Garcetti</u>.

461 U.S. at 148)).  At the opposite end of the spectrum, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern."  Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992).

        According to Corbett, as earlier noted, the purpose of his protest was to "call attention to" (1) issues relating to defendants' unequal treatment of students, arbitrary enforcement of rules at GW, and mistreatment of administrators who refused to comply with defendants' corrupt practices; and (2) the lack of clarity and effective communication at GW regarding protocols that affect student safety, such as the procedures for closing of the campus. (Pl.'s Dep. at 235-38, 249-50).  Whether Corbett actually raised these concerns at his November 27, 2007 hotdog sale is a contested factual issue.  In its Order denying defendants' motion to dismiss, the court, as is the rule at that juncture, generously construed plaintiff's complaint and found it alleged that "Corbett communicated [these] ideas, verbally or otherwise, in some manner which reasonably could be understood by the general public." Corbett, 780 F.Supp.2d at 493, n.2.

The court now concludes that, through discovery, plaintiff has presented sufficient evidence to require that the court resolve that issue in his favor at this stage as well. During his protest, Corbett claims to have expressly communicated these concerns to students and other members of the public who stopped by, although he cannot name them individually. (Id. at 238-48). Corbett also contends that his protest was in part "symbolic": that the sale of hotdogs was a reference to a specific instance in which defendants treated students unfairly -- the April 20, 2007, cookout -- and that his donation of profits from the sale to support battered women and children emphasized that his protest was in support of "the downtrodden." (Id. at 250). Finally, Corbett gave interviews to several media outlets, and the public's response to media coverage of his protest indicates that, at least to some, Corbett's message was well-understood.[5] As a result, it could be

---

[5] See Pl.'s Ex. 12, News Stories and Comments, in which plaintiff cites his longstanding opposition to unfair and preferential treatment as part of the reason for his protest. Reader generated comments to a story on the website of a local media outlet also include the following statements, inter alia, from members of the community:

- "Remember [Corbett] wouldn't give favors for Senator's kids etc . . . that was the beginning of the Duerring dislike for him."
- "Sounds to me like they have a person leading the school and [sic] is poorly qualified to do so. The
  (Cont'd)

concluded that Corbett did, at the time of his protest, actually engage in speech about the topics with which he now claims to be concerned.

Next, it is for the court to determine, as a matter of law, whether these topics qualify as "matters of public concern" for purposes of the <u>McVey</u> analysis.  First, as the court previously recognized in its Order denying defendants' motion to dismiss, speech regarding GW's alleged preferential treatment of certain students based on their parents' social status implicates an important matter worthy of First Amendment protection.  Such speech involves "allegations of "wrongdoing or breach of public trust," <u>Connick</u>, 461 U.S. at 148, inasmuch as the public expects fair and impartial enforcement of the rules by school administrators.  In addition, the Supreme Court and

_____

> first things she [Nancy Alexander] would have done to
> promote safety is to communicate with everyone . . .
> that is her job . . . . She needs to be accountable
> for her lack of actions and poor judgment."
> - "Peter Corbett is a man of the highest morals.
>   Because he does not play politics he is being
>   attacked."
> - " . . . [S]ome people in power cannot handle it.  Ron
>   [Duerring] is known for having a temper when he does
>   not get his way.  He has pressured teachers to change
>   grades, give parents copies of test papers etc."

(Pl.'s Ex. 13, WSAZ News Stories and Comments).

18

the Fourth Circuit have, in analogous circumstances, recognized
that speech relating to discriminatory practices in public
schools involves a matter of public concern.  See id. at 146
(noting that statements about a "[s]chool [d]istrict's allegedly
racially discriminatory policies involve[ ] a matter of public
concern."); Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir.
2004) (holding that "a complaint published in a school newspaper
that a public school discriminates on the basis of sex raises a
question of public concern.").  Similarly, Corbett's statements
regarding defendants' unequal treatment of students on the basis
of their social status would likely be of great interest to
members of the community, particularly parents of students at GW
and other schools within the Board's purview who did not receive
the preferential treatment allegedly accorded to children with
more influential parents.  Plaintiff's claimed speech on this
topic, in other words, appears to have addressed an issue with
which "the public or the community is likely to be truly
concerned."[6]  Goldstein v. Chestnut Ridge Volun. Fire. Co., 218

---

[6] The court also notes that the extensive news coverage of
plaintiff's protest supports the contention that his speech
touched on matters of public concern.  See Cioffi v. Averill
Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 165 (2d Cir.
2006) ("To gauge the community's interest in [plaintiff's]
speech we need only look to the abundant press coverage accorded
[it]"); Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 189 (5th
Cir. 2005) ("'[t]he very fact of newspaper coverage [of the
(Cont'd)

F.3d 337, 352 (4th Cir. 2000) (internal quotations and citations omitted).

The same can be said for Corbett's allegations regarding the efficacy of GW's procedures for closing its campus.  The Fourth Circuit has previously recognized that "matters related to public safety are quintessential matters of 'public concern.'"  Id. at 353; see also Cioffi, 444 F.3d at 164 (recognizing that "perceived defects in the level of oversight and supervision" at a high school implicates welfare and safety of students, which are matters of public concern).  The ability of school administrators to occasionally close GW's campus, defendants acknowledge, is important to maintaining student safety.  (See Duerring Dep. 37-38).  Accordingly, there can be no doubt that Corbett's criticism of these procedures also touched on matters of clear public concern.

In contending that Corbett's speech is not entitled to First Amendment protection, defendants primarily argue that there is insufficient evidence that the unequal treatment of students at GW ever occurred.  Speech is protected, however, so

matter discussed by the employee]' indicates that 'the public was receptive and eager to hear about [the matter]'") (footnote omitted).

20

long as it "bring[s] to light actual <u>or potential</u> wrongdoing or
breach of public trust." <u>Jurgensen</u>, 745 F.2d at 879 (emphasis
added)(quotation omitted).  As defendants themselves have noted:
"Plaintiff only needs to prove that he was protesting these
issues and that [the Board] terminated him for these actions. .
. . The [Board] is not on trial regarding issues of whether
unequal treatment of students actually occurred."  (Def.
Kananwha County Board of Education's Response to Pl.'s Mot. to
Compel, dkt. no. 62, at 9).

        As a result, the court concludes at this stage that
Corbett's November 2007 hotdog sale addressed, at least in part,
protected matters of public concern.  Even if Corbett's speech
was in part motivated by his disagreement with a private,
personnel decision, the court notes that Corbett's motivation is
not dispositive of his First Amendment claim, especially in
light of the court's conclusion that the content of plaintiff's
speech touched on matters of public concern.  <u>See</u> <u>Reuland v.</u>
<u>Hynes</u>, 460 F.3d 409, 417-18 (2d Cir. 2006 (collecting cases and
observing that "circuits that have considered the role of motive
on the question of public concern have almost uniformly agreed .
. . that motive is not dispositive"); <u>Jackson v. Bair</u>, 851 F.2d
714, 720 (4th Cir. 1988) (holding that "content, subject-matter,

is always the central aspect" of the public concern inquiry).
By the same token, even if part of Corbett's speech at the
hotdog sale amounted to nothing more than personal grievances
about the conditions of his employment, this would not be fatal
to his First Amendment claim.  See Campbell v. Galloway, 483
F.3d 258 (4th Cir. 2007) (holding that employee's letter "cannot
be deemed to be a matter of private concern simply because the
bulk of the letter addresses what can only be viewed as personal
grievances" where at least some of plaintiff's statements
touched on matters of public concern).  The court accordingly
moves to the next step of the First Amendment retaliation
analysis.

### 2.  Second McVey Prong - Balancing of Interests

        Under the McVey test's second prong (also known as the
Pickering balancing test) the court assesses whether Corbett's
interest in First Amendment expression outweighed the defendant
employer's interest in providing effective and efficient
services to the public.  Ridpath, 447 F.3d at 317 (citing McVey,
157 F.3d at 277); Jurgenson, 745 F.2d at 881, n.20.  The court
"must take into account the context of the employee's speech and
the extent to which it disrupts the operation and mission of the

institution." Ridpath, 447 F.3d at 317 (citing McVey, 157 F.3d at 277)(internal quotation marks omitted).  Factors relevant to this inquiry include:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

Id.  "Both [the Fourth Circuit] and the Supreme Court have also included the value of the employee's speech to the public in the Pickering balance."  447 F.3d at 317 n.28.

    There is little evidence that Corbett prevented defendants from providing effective and efficient services to the public.  Corbett conducted his protest during his suspension, off school grounds, and away from his coworkers. Defendants' sole contention with respect to this analysis is that Corbett contacted a number of GW students to "rally them up" against defendants at his hotdog sale, and that one such student was suspended as a result of making an unapproved announcement about the event to the student body.  (Pl.'s Dep. at 128, 136-38; Def.'s Mem. at 17).  This minimal interference

with the operation and mission of the institution must be weighed against both Corbett's interest in free speech and the value of Corbett's speech to the public.  As the Supreme Court has observed,

> "[w]ere [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."

Garcetti v. Ceballos, 547 U.S. 410, 420 (2006) (quoting San Diego v. Roe, 543 U.S. 77, 82 (2004)).  As previously discussed, Corbett's speech implicated matters of public concern regarding student safety and discrimination in a public high school.  In addition to Corbett's right to free speech, members of the public have a significant interest in learning of such allegations.  As a result, the Pickering balance is tipped in plaintiff's favor.  The court accordingly moves to the final step of the First Amendment retaliation analysis.

### 3.  Third McVey Prong - Causal Relationship

The third and final prong of the McVey test requires the plaintiff to "demonstrate a causal relationship between his protected speech and the termination of his [employment]." Ridpath, 447 F.3d at 318 (citing McVey, 157 F.3d at 277-78).

24

"[T]o establish this causal connection, a plaintiff in a
retaliation case must show, at the very least, that the
defendant was aware of her engaging in protected activity."
Constantine v. Rectors and Visitors of George Mason, 411 F.3d
474, 501 (4th Cir. 2005) (citing Dowe v. Total Action Against
Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)).
"'Knowledge alone, however, does not establish a causal
connection' between the protected activity and the adverse
action." Id. at 501 (quoting Price v. Thompson, 380 F.3d 209,
213 (4th Cir.2004)). "There must also be some degree of
temporal proximity to suggest a causal connection." Id. A
lengthy time lapse between when the public official becomes
aware of the protected activity and the alleged adverse action
"negates any inference that a causal connection exists between
the two." Id. (quoting Dowe, 145 F.3d at 657) (internal
quotation marks omitted).

The "'causal relationship' inquiry . . . involves two
steps.'" Peters v. Jenney, 327 F.3d 307, 323 (4th Cir. 2003)
(quoting Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183, 193 (4th
Cir. 1994)). "In the first step, the employee bears the burden
of establishing the requisite causation to prove that the
protected speech was a motivating factor or played a substantial

25

role in inducing the adverse action." <u>Id.</u>  "If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have [taken the adverse action against plaintiff] even in the absence of the protected speech." <u>Id.</u>

As to this first step, Corbett asserts a causal inference that is relatively clear.  Beginning November 27, 2007, he commenced his protest outside Board headquarters.  On December 3, 2007, defendants suspended Corbett due to his "recent actions and statements."  (Pl.'s Ex. 7, Letter from Duerring to Plaintiff).  Corbett was not allowed to return to work and remained suspended indefinitely until, following a lengthy investigation and disciplinary hearing that were not scheduled until after his expressive conduct, his employment was terminated on September 9, 2008.  The chronological nature and temporal proximity of these events thus suggests a causal connection.

Defendants respond that Corbett cannot establish causation because it is undisputed that Corbett never explicitly communicated to defendants the precise matters of public concern he was protesting.  However, the Supreme Court has recognized

that protected speech may be communicated through non-explicit means when "[a]n intent to convey a particularized message [is] present" and "the likelihood [is] great that the message would be understood by those who viewed it." <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989).  As a result, "a narrow, succinctly articulable message is not a condition of constitutional protection."  <u>Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston</u>, 515 U.S. 557, 569 (1995).

Thus, in this case, the fact that Corbett did not nail a list of grievances to the Board's door does not mean defendants were unaware that his message touched on protected matters of public concern.  First, Corbett asserts that the timing, form, and context of his expressive conduct implicated the matters of public concern articulated in his single-count complaint.  Specifically, he contends that the act of selling hotdogs was a symbolic reference to his suspension for supervising a similar cookout at GW.  Inasmuch as Corbett had previously complained to defendants that his suspension in connection with that event was the result of flawed protocols that jeopardized student safety (Pl.'s Dep. at 81, 84-86, 232-

233), it is not unreasonable to infer that defendants could have made the connection Corbett intended.

Stronger evidence, however, can be drawn from the media coverage of Corbett's protest.  As discussed above, in the days following Corbett's hotdog sale, numerous news outlets chronicled the event.  Not only do these articles discuss the matters of public concern about which Corbett protested, but reader comments make clear that Corbett's message regarding student safety was well-understood by those who read the stories.  (See supra, pt. II.B.1).  Inasmuch as these articles and comments appeared in prominent Charleston newspapers and on popular websites, it could be concluded that defendants saw, read, and comprehended Corbett's message as well.

At bottom, defendants contend that they did not subjectively understand the content of plaintiff's message, and this may ultimately be the case.  But if this alone were a defense to a First Amendment retaliation claim, all defendants in symbolic speech cases could win summary judgment simply by claiming that they did not grasp the message the plaintiff intended to convey.  Instead, viewing all the evidence in the light most favorable to him, Corbett is entitled at this stage

28

to the inference that defendants were aware that his protest included speech protected by the First Amendment, and that such speech was a substantial and motivating factor in his termination soon thereafter.

The burden then shifts to defendants who must put forward evidence that Corbett would have been fired even in the absence of his protected speech.  To this end, defendants argue that that they are entitled to summary judgment because the true reason for Corbett's termination was not his exercise of First Amendment rights but rather the result of an internal investigation that revealed numerous instances of inappropriate conduct and violations of Board policy.[7]  Again, while this may prove true in the end, the court must conclude, at this stage, that Corbett has raised a genuine issue of material fact as to

---

[7] Defendants point out that Corbett acknowledged during his deposition that the decision to terminate his employment was not based upon any alleged First Amendment activity but on the hearing examiner's report alone.  (Pl.'s Dep. at 251).  However, within the context of the record as a whole, this single statement does not resolve the causation issue.  According to Corbett, "it is clear from the colloquy that follows" that he misunderstood counsel's question in the deposition.  (Pl.'s Mem. at 18, n.16)  "Indeed, [Corbett] subsequently made clear that he believes Defendants terminated him for exercising his first amendment rights." (Id.; see Pl.'s Dep. at 251-260).  It is for the jury to resolve this dispute.

whether defendants' purported grounds for terminating his employment were pretextual.

It is to be observed that the hearing examiner's report was predicated on a list of charges that was not compiled until after Corbett's protest.  (Duerring Dep. at 60-61).  Many of the events alleged therein took place several years prior to the report, but there is no indication that defendants intended to investigate or take disciplinary action in connection with these alleged events until after Corbett had engaged in his protected speech.  (See Def.'s Ex. 7, Decision of the Hearing Examiner).  Notably, none of the incidents allegedly taking place or beginning prior to 2007 was deemed significant enough to warrant inclusion in any of Corbett's annual performance evaluations.  (See Pl.'s Ex. 15, Evaluations for School Years 2000/2001 - 2005/2006; see also Pl.'s Ex. 16, Deposition of Former GW Principal James Vickers).  The last evaluation that Corbett received, in 2006, commended him for being a "tremendous asset to the school in his role as assistant principal."  (Id.).  Under these circumstances, one might conclude that defendants' true motive for terminating plaintiff was retaliation for his expressive conduct during the hotdog sale protest.

Corbett's case is perhaps weakest on this third <u>McVey</u> prong, in that it relies upon so many inferences.  Yet this court has previously observed that where motive is a critical issue, such as in a discriminatory discharge action, summary judgment is seldom appropriate "inasmuch as state of mind generally is dependent on resolution of conflicting inferences drawn from circumstantial or self-serving evidence . . . or on the credibility of witnesses."  <u>Thacker v. Peak</u>, 800 F.Supp 372, 376 (S.D. W. Va. 1992)(citing <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979) and <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985)).  Accordingly, the court concludes that genuine issues of material fact exist regarding the causal element of Corbett's First Amendment claim, thus precluding summary judgment.

### III.

For the reasons set forth above, it is ORDERED that defendants' motion for summary judgment be, and it hereby is, denied.

31

The Clerk is directed to transmit copies of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER:  May 21, 2012

John T. Copenhaver, Jr.
United States District Judge